The first two cases for argument this morning were consolidated. They are 151874 and 151731 Norred v. Medtronic. Mr. Curnell, whenever you're ready. May it please the court. The board's inconsistent and erroneous decisions in the 110, 111, and 395 matters cannot be allowed to stand. If we were to affirm in the 110 and the 111, we wouldn't have to reach the 395, right? That is correct, Your Honor. My name is Jim Curnell with Erickson, Curnell, DeRusso, and Klappes. And with me is David Marcus of Bartleman Marcus. We represent the patent owner, Dr. Troy Norred. The board construed the same claim terms differently in different parts of the same written decision. These include the means for mounting, means for maintaining, and the ring number. If the board construed these claim terms consistently throughout its written decisions, it could not have reached the results that it did. Further, the board construed the same claim terms differently in different decisions involving the same parties in the same patent. Could you focus maybe on these one at a time and tell us what's wrong with the decision that they reached in the 110? What's the error there? In the board's decisions to institute the 110 and the 395 matters, the board construed means for mounting broadly to mean the membrane hinged, secured, or hingedly attached about the aperture of the ring. What's wrong with that construction? Are you saying it's too broad? No, if that is the construction, then that's the construction that the board should have used throughout the proceedings. What the board then did was in its final decision of the 110 matter, it construed the means for mounting narrowly. Let's stick just with the first one, with the 110. Yes. Did they make a construction error in the 110? Yes, they did. And what was the error? The error was construing the means for mounting to be fingers or arms hingedly attached or hingedly secured to the ring member and a free end spaced therefrom. Okay, so what's wrong with that? That claim construction only goes to two of the embodiments shown in the 228 patent. The second and third, not the natural valve that's shown in the 228 patent.  No. That is too narrow because it's also that construction comes directly from Claim 17. There is no limitation in Claim 16 that includes fingers or arms hingedly attached. That limitation comes from Claim 17. And it does not cover the natural valve that's shown in Figures 18 and 19. Well, what's the consequence of that error in your view? Well, there's two consequences. First, if the claims were construed to mean a membrane hingedly secured or hingedly attached about the aperture, the broad meaning, then Di Matteo would not anticipate the 228 Claim 16. If it's construed narrowly, as the board did in its final decision, then none of these other patents... If it was construed narrowly, then the... I'm sorry. Let's flip this. If it was construed broadly, as they did in the initial decision of a membrane hingedly attached about the aperture of the brain, then the amendment, the proposed amendment to Claim 25 would have been allowed because it did not broaden the scope of Claim 16. So, if fingers and arms are required for mounting, which is what the board said, right? Yes. Right. You're saying that under the board's construction, they still should have allowed the amendment? Is that the idea? Well, if it said that it is fingers or arms, then Di Matteo does not anticipate that claim because Di Matteo does not have fingers and arms. They found that it did, though. Well, they found that it had a membrane hingedly secured and hingedly attached to the aperture of the brain. That's what they found in the initial decision, the decision to institute. Then, when it was looking at the motion to amend, they changed their interpretation to mean fingers or arms hingedly attached or hingedly secured to the ring member in a free-end space therefrom. So, we had a shifting interpretation of what the means for mounting meant in that same, in the 110 case. Well, where in the final decision do they say that it doesn't require fingers and arms? It's in Appendix A, 7, and 8 in the final decision for the 110. Do you have that in front of you? Do you want to tell us what you're pointing to in A7 and A8? This is in the Addendum 7 and 8? Yes, Addendum 7 and 8, and it's actually on page 7. It says, and it starts at the bottom of page 7, it says, Patent owner does not contest petitioner's proposed claim construction of means for mounting element recited in Claim 16. Well, that was erroneous because in the 110 decision to institute, the board said the opposite, that Medtronic did not contest what ours meant or that the parties were in agreement. But at the bottom of the page that you're pointing to, they say to mean fingers and arms hingedly attached. So, I don't see that they have adopted a claim construction in the final decision that doesn't require fingers and arms. Well, they did. They originally adopted a claim construction in that the membrane was hingedly secured and hingedly attached about the aperture. That was the first claim construction. What are you saying? They changed the claim construction from the initiation decision to the final decision? Yes. Why are they not entitled to clarify the claim construction? Well, because the claim construction that they clarified to is what's shown in Claim 17. It's not required of Claim 16. There's two embodiments that have fingers and arms. The third embodiment of the natural valve does not have fingers and arms. Well, what's the proof that Claim 16 includes that third embodiment? Well, there's nothing to preclude it. If that claim is read broadly, the broadest reasonable interpretation of a means for mounting, if you go to what's shown in the specification, it does not require fingers and arms. In fact, a natural valve does not have fingers and arms. And that's what's shown in Figures 18 and 19. Okay. Well, before you run out of time, why don't you tell us what's wrong in the 111 decision? In the 111 decision, the board construed the means for maintaining broadly to mean the combination of rods 104 interacting with stent 28. All right. That was in the decision to institute. When it was looking at the proposed amendment in the 111 case, the board narrowly construed means for maintaining to mean rods 104 that must be separate from the stent system 28. So before it was just rods interacting with the stent system. Then in the final decision, it found that the rods have to be separate, must be separate from the stent system, where there's not a single embodiment shown in the 228 patent that shows separate rods that interact with the stent system. I thought the board was consistent in saying that the rods had to be connected to the stent. Right, that there are rods connected to the stent, that they're interconnecting rods. Right. But then in denying the motion to amend, the motion to amend said there is a stent system with interconnecting rods and that the valve is connected to the interconnecting rods. You eliminated the means for maintaining language in the amendment, right? And put in specific structure that's shown in the patent. Okay. Well, but the board said that that didn't show the rods connecting to the stent, and in that sense, you broadened the claim, right? Right. Exactly, and that's what was wrong with the board's decision. There's not a single embodiment or a description of separate rods that are separate from the stent system. The connecting rods are. . . I'm sorry, I'm not following what you're saying. I'm not seeing the inconsistency that you apparently see. Well, the inconsistency is they said that because we did not call out a separate rod that is then connected to the stent system. In connection with the amendment. In connection with the amendment, that that broadened it from the means for maintaining, which are just rods that interact. In fact, interact with the stent system. In fact, in the proposed amendment, there are interconnecting rods that are connected to the stent system. But they wanted separate connecting rods, even though there's no separate connecting rods in the patent. Okay. Is there anything else wrong with the 111 decision? Those are the two main problems with the 111 decisions. We have the same issue in the 395 decision, where there are inconsistencies between what the board found and what the board, in the final decisions. So those all go to reliefs being sought that would say the board should have allowed the amendment. It wouldn't go to the questions of whether the findings of anticipation by the board, right? Well, it depends. It depends on which way this court construes those claims. If the court construes them broadly, then the amendments should have been allowed. If the court construes those narrowly, those terms narrowly, then the prior art doesn't show those limitations. The prior art does not show fingers or arms separate, attached or hingedly secured to a ring member. It's not shown. The prior art does not show the means for maintaining where there is a rod that separately maintains the ring member in place. So they concluded otherwise, right? Well, yes, they did conclude, and that's the error. That's a fact determination. No, I don't believe it's a fact determination because it is a construction issue.  is de novo and is a matter of law for this court to decide. Well, I'm still struggling with what's the claim construction error. They said the rods had to connect to the stent, right? And that's part of the means for maintaining. Yes. So where's the claim construction error? Well, it's because they changed. Originally, they said that there does not have to be separate rods. It's just rods interacting. Where does it say that? In the initial decision. The initiation decision? Yes. What about in the final decision? Well, in the final decision, it didn't change that except for when it was looking at the amendments. Show us where in the final decision they've used two different claim constructions. They don't explicitly use the first claim construction from the decision to institute. They only change it with respect to discussing the amendments. Well, where in the anticipation aspect of the final decision do you see that they've used the wrong claim construction? Well, in the anticipation, they did not go back and reapply their new claim construction, the narrower claim construction that they applied to the amendments. Requiring connecting rods. Required separate connecting rods. They didn't then go back and say, okay. Where's the discussion? That's only in the part for the amendments. If we go forward. Well, show us where they discussed in the final decision the connecting rods requirement in connection with the anticipation issue. They did not. That's the problem. They didn't discuss it at all? They didn't. They just said that it was, that was already shown in the previous. Where's the, what page is the discussion of the anticipation issue? In the 111. It starts on, in the 111, it starts on page 15 of the decision. And the, specifically the means for maintaining is, for the Shrek reference, is at page 22. But it says we've construed the means for maintaining. Clause to be a combination of rods 104 interacting with stent 28. How's that different from the decision in connection with the amendment? Then in the amendment, what they say is that there has to be separate rods. What page is that at? It's on page 30. Which is A447, right? Yes. But if you look at the bottom of page 29, which is A446, it says, according to Petitioner,   infamously seeks to enlarge the scope of claim 20 because it does not include rods 104 on the valve that interact with the rods forming the stent. Yes, that's exactly what the board found in this case. I thought you were talking about that they said it had to be separate. Right. So they are saying that there has to be rods 104 that interact with the rods forming the stent. So they're saying they have to be a separate recitation of these rods. But there's, again, if you look at the figure 18 in the 228 pattern, it shows rods that connect to the ring member. It also shows extending from the top, it's going into the stent. There's nowhere that is shown any connection, a joint, a hinge, anything that connect a separate connecting rod to a stent. Those rods, they're interconnecting rods, and they're merely just rods where the valve is connected. Okay, we're well into your rebuttal, so why don't we save that and hear from the other side. Thank you. Thank you. Mr. O'Quinn. Thank you, Chief Judge Prost. May it please the court, John O'Quinn on behalf of Medtronic. Let me start where we just left off. The issue that the board found with respect to the connecting rods and the means for maintaining is that he sought to eliminate the structure, the only structure that was disclosed within the patent, namely where you have a ring member that is separate from a stent system and that they are connected by connecting rods, and he wanted to eliminate having the stent system- In the amendment. In the amendment, exactly, Judge Dyke. He wanted to eliminate having a stent system that was connected through connecting rods and instead replace it with just the stent system, so that essentially you could at that point have the valve integrated into the stent system itself. The board properly found that that was a broadening, and indeed it's inconsistent with the way that he described his own invention in paragraph 83 of his declaration, which you can find at A2153 of the joint appendix in the first of these appeals, where he says, Each embodiment of my invention depicted in the 228 patent features a valve that connects to but operates independently from the stent. And he goes on. So what happened in the amendment, and if I understand it correctly, at the end of 28, the means for maintaining is taken out. It just says a stent system having a plurality of interconnected rods, but there isn't any requirement there that those rods be connected to the stent. Is that the point? The point, Judge Dyke, is that he's doing away with having to have separate rods that connect to the stent and instead just saying you can have a plurality of rods that make up the stent system itself and that that's enough. And the board found that that was broadening because instead of now, as the board said in its opinion at A447, you've got two types of rods. You've got rods that make up the stent, and you've got the tangential rods, and that's the term in the specification that talks about them being tangential to the sinus of the aorta, the tangential rods that then connect the separate stent system to the ring. And the board said that's all being read out and all that you're going to be left with is the rods that make up the stent system itself. And that was therefore broadening because, and there was no argument that he made below, waived the notion that just having a stent system was equivalent to having a stent system plus connecting rods. And again, it makes sense that those wouldn't be equivalent because you're replacing having a separate stent system from a separate ring member that is connected up and saying, okay, now I'm going to do it in a way that would read on items that have it all integrated together. The board said that's broadening, and properly so. And with respect to his means for mounting, which was an issue in the 110 IPR and also the 395 IPR, the board found that that was also broadening because he was eliminating the requirement that you have fingers and arms. And his whole, Dr. Norad's entire argument on appeal consists of saying, well, there's another embodiment. The natural tissue. The natural tissue embodiment that's found in figures 18 and 19 in the accompanying description. And that doesn't have fingers and arms. Now, the problem with his argument is, as this court held in Medtronic versus ACS, you have to have a clear link between the disclosed embodiment and the claims. And there is no clear link between the tissue valve embodiment and claims 16 through 19. In fact, quite the opposite. There's a clear link between the tissue valve embodiment and the tissue valve claims, claims 20 through 24, which specifically recite a tissue valve. He was very intentional in the language and the specification and in the language of the claim, referring to tissue in the embodiments in figures 18 and 19 and tissue with respect to claims 20 through 24, and referring to membrane with respect to the embodiments found in figures 10 through 17 and with respect to the claims 16 through 19. More than that, even setting aside the whole issue of fingers and arms, his proposed amendment clearly eliminates a claim element. Because the claim, if you look at claim 16, it requires that you have a membrane, but also requires that you have a means for mounting and means for moving that membrane. And his proposed amendment, that's going to be gone. All that you're left with is the membrane. You literally will have vitiated a claim element, which is the means for mounting and moving the membrane. So the board was absolutely correct in finding there was a broadening. Now, to be sure, yes, the board in its initiation decision found that it was sufficient for purposes of initiation to say that it was hingedly attached. But then it engaged the issue in its final decision and consistently required that there be a fingers or arms limitation in the 110 IPR. The argument that he wants to make that that's not disclosed in DiMatteo is a new argument being made today. It's not an argument that was in his briefs. And you can find how that limitation is met at A101 of the joint appendix in the appeal from the 110, which is our claim chart laying out where the arms are found with respect to DiMatteo. Could I turn you to another aspect of the 111? And that is, if I understand their argument, they're saying that SHREC doesn't anticipate because it's not placed in the ascending aorta. And I've read the record here, and it seems to me that there are somewhat conflicting definitions of what the ascending aorta is. And what the board said is that placing it in the ascending aorta is not part of the claim requirement. Could you address that? There is language tying 28 to placement in the ascending aorta in the specification. And why is it that that shouldn't be part of the structure to perform this function? Do you understand what I'm saying? I do understand. And so, Judge Dyke, there are three issues that are wrapped up in that. One is what's the proper way of construing it, number one. Number two, as a factual matter— Do you agree that the record's sort of cloudy on what the ascending aorta is? In other words, whether it goes down to the annulus? Our expert, Dr. Hill, testified and provided evidence that there are competing definitions for what the ascending aorta is. He said that in his view, and you don't have to take his word for it, there's scholarship that supports this, that the ascending aorta is everything that includes the root up. Because you have an ascending aorta coming out of the heart in contrast to the descending aorta, which then runs down the body. He acknowledged that there is some literature that refers to the root as being separate from the ascending aorta. But he said that many regard the ascending aorta as including the root. And indeed, Dr. Norad's own expert, Dr. Ketchings, conceded— and this is at A4144 of the Second Joint Appendix— he conceded that the correct technical definition of ascending aorta includes the root. Because he said, quote, technically speaking, the ascending aorta is the whole part from the valve all the way up. Yeah, but then he seems to take it back in the next exchange. And so the point being here is there is—if you even—and we've jumped past the first question of whether or not ascending aorta is required. It's not, and I'll come back to that. But even if it were required, you have a fact dispute about whether or not something that's placed in the root would be considered to be in the ascending aorta. Yeah, a fact dispute that doesn't seem to have been resolved by the board. Well, I thought that the board's decision accredited Dr. Hill with respect to this, and it certainly accredited Dr. Hill. Where does it say that? Well, if you look, you have the board addressing more generally this issue at A440 of the Second Joint Appendix. I'm using the attachments of the blue brief. What page is it in the addendum? Or just what page of the opinion is it? Twenty-three. Twenty-three, thank you. Is that right? I believe that's right. This is where it talks about the placement and positioning of the prosthetic aortic valves within the aorta. It's typically within the discretion of the physician. And it goes on to note that aortic valves can be placed at different positions within the aorta, such as the lower positions of the aortic root, or more upwardly within the ascending aorta. Judge Dyke, that may get to the third issue, which is whether, as a factual matter, Shrek could be implanted within the ascending aorta. But you have the board crediting Dr. Hill's testimony with respect to where the device could theoretically be implanted. Yeah, but I don't see them crediting his testimony as to what constitutes the ascending aorta. That's the problem. So I agree. I don't think that the board explicitly addresses and resolves that issue. I think the board recognizes that that is an issue, and I think that they generally credit Dr. Hill. And you have the testimony from Dr. Hill, as well as the testimony from Dr. Ketchings, that would show that the ascending aorta could be considered anything that includes the root. Let's turn to what they did decide, which is that having it in the ascending aorta is not part of the claim limitation. Right. And the reason for that, and the board said this at A3077. And I guess the question there is whether putting it in what the patentee now claims is the ascending aorta is really part of the structure necessary to perform the claimed function, or whether it's extraneous to that. And I think there's a couple of points. Number one, when you're deciding whether or not something is structure that is required for a means plus function limitation, the board quoted this court's decision in microchem. And microchem makes clear that claim interpretation under 112 paragraph 6 doesn't permit the incorporation of structure from the written description beyond what is necessary to perform the claimed function. The board goes on to make the point that the means for maintaining refers to the specific structures. This is at A3077, refers to the specific structures of the claimed aortic valve that maintain the ring member, rather than a specific location within the aorta. And while it's true, Judge Dyke, that there are some places in the specification that refer to the stent as being an ascending aortic stent, those are few and far between. It refers to 28 in a lot of different ways. It refers to it as, quote, stent system 28, stent scaffolding 28, stent lattice 28, combined stent 28, and also ascending aortic stents 28. Let's take the references where it does refer to it as being the ascending aorta. Does that make it part of the structure necessary to perform the function, or is the fact that it's in the ascending aorta incidental to the performance of the function? I think it's clearly the latter, Judge Dyke. The structure, where it is put, has nothing to do with the structure itself, and I think this is where the board crediting Dr. Hill is particularly important. Dr. Hill makes the point that stents can be put in a lot of different places, and it may be that he preferred or contemplated that at least in some circumstances the stent would be put there, but the structure is the stent. The claim is to a valve. The board interpreted that the means for maintaining is including the stent system itself. My argument was it didn't even include the stent system. It was just the connecting rods that were the means for maintaining. But that doesn't go to where it's actually located. The question of where as opposed to what, the board resolved by saying it's what, and if the board resolved it a different way, I think it would lead to a serious question of indefiniteness with respect to these claims. Obviously, that issue wasn't before the board in the context of the IPR, but I think it's a significant one to keep in mind in understanding the construction that the board came to. Okay. If there are any other points that the court would like me to address, I'm happy to answer any questions. If not, I will yield back the balance of my time. Thank you. That's fine. Thank you, Chief Judge Preston. Your Honors, very quickly and briefly, there is only one stent system shown in the 228 patent. It's the ascending aortic stent. In every single figure, it refers to the ascending aortic stent. The other thing, whether it's a stent structure, it's a lattice structure, that's talking about the specific structure of this ascending aortic stent. If I can refer you to our reply brief for the consolidated case, page 22, there's an illustration in it. This is from joint appendix A1632, the anatomy of the aortic root and the implications for valve sparing surgery. It shows that the lower part, which includes the coronary artery, is the aortic root and that the ascending aorta is above it. That's where a valve cannot be placed in the ascending aorta. Otherwise, it will kill the patient. So it's important that that stent structure is in the ascending aorta where the valve is at the root of the aorta. I see that my time is up. Thank you. Thank you. We thank both parties in the cases we've seen.